GAMALIER PÉREZ ALDARONDO, peticionario, *v.* TRIBUNAL SUPERIOR, SALA DE AGUADILLA, HON. JOSÉ A. BIANCHI, JUEZ, demandado.

*Número*: O-73-123 *Resuelto*: 20 de febrero de 1974

2

Santos P. Amadeo y José Enrique Amadeo, abogados del peticionario; Peter Ortiz, Procurador General Interino, abogado del demandado.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

Gamalier Pérez Aldarondo, aquí peticionario, fue convicto en juicio por jurado celebrado ante el Tribunal Superior, Sala de Aguadilla, de tres cargos por infracción a la Ley de Narcóticos de Puerto Rico, Núm. 48 de 18 de junio de 1959, 24 L.P.R.A. secs. 973–976m. (1) Los cargos consistieron en (1) posesión, (2) transportación y (3) venta de la droga narcótica conocida por marihuana. Fue sentenciado a cumplir de diez a quince años de presidio en cada cargo, con trabajos forzosos, a cumplirse concurrentemente entre sí. No conforme, apeló para ante nos y al mismo tiempo solicitó del tribunal sentenciador que le fijara fianza en apelación. Dicha solicitud

---

(1) Derogada posteriormente por la vigente Ley de Sustancias Controladas, Núm. 4 de 23 de junio de 1971, 24 L.P.R.A. secs. 2101–2607.

le fue denegada el 3 de noviembre de 1971 y mediante moción ante nos de fecha 11 de noviembre de 1971, caso M-71-150, reiteró la misma solicitud. Oído el Procurador General dictamos resolución denegando de plano dicha moción.

El 28 de julio de 1972 el peticionario presentó una nueva moción ante el Tribunal Superior, Sala de Aguadilla, solicitando nuevamente que se le fijara fianza en apelación. Se celebró una vista y como transcurriera tiempo sin que recayera resolución, recurrió a este Tribunal con una "Solicitud de Mandamus o Moción Solicitando Fianza en Apelación", que presentó el 3 de abril de 1973. Nos pidió que ordenáramos al juez sentenciador que resolviera sobre los méritos de su moción o que, en la alternativa, tomáramos su moción como una solicitando fianza en apelación. La solicitud de *mandamus* se hizo académica cuando el día 12 de dicho mes y año el Tribunal Superior dictó resolución declarando sin lugar la moción. Así las cosas el peticionario volvió a insistir ante nos en su solicitud de fianza en apelación.

El 2 de mayo de 1973 resolvimos "no ha lugar" a dicha moción. El peticionario solicitó reconsideración, que denegamos por resolución de 26 de junio de 1973.

En ninguna de nuestras resoluciones declarando sin lugar la moción de fianza en apelación—ni en el caso M-71-150 ni en éste—creímos necesario exponer las razones para ello. Está ante nos ahora un escrito del peticionario en que nos solicita que expliquemos dichas razones. Hace descansar su solicitud en *United States ex rel. Keating* v. *Bensinger*, 322 F.Supp. 784 (N.D. Ill. 1971), una decisión de una Corte de Distrito federal con sede en el estado de Illinois.

Antes de entrar en la consideración de dicha decisión conviene determinar el alcance de la Regla Núm. 198 de las Reglas de Procedimiento Criminal, base del derecho a fianza mientras penda una apelación para ante este Tribunal. La Constitución del Estado Libre Asociado de Puerto Rico con-

sagra en su Art. II, Sec. 11, el derecho de todo acusado a "quedar en libertad bajo fianza antes de mediar un fallo condenatorio." Guarda silencio en cuanto a la concesión de ese derecho después de convicto el acusado. De ahí que ese derecho tenga su fuente, no en una disposición constitucional, y sí en un ordenamiento procesal promulgado por este Tribunal, cuya Regla 198 lee de la manera siguiente:

"Después de convicto un acusado de un delito que no apareje pena de reclusión perpetua, si el acusado entablare recurso de apelación o de *certiorari* para ante el Tribunal Supremo, se admitirá fianza:

(a) Como cuestión de derecho, cuando se apele de una sentencia imponiendo solamente el pago de multa.

(b) Como cuestión de derecho, cuando se apele de una sentencia imponiendo cárcel en delitos menos graves (*misdemeanors*).

(c) A discreción del tribunal sentenciador, o del Tribunal Supremo, o de uno de sus jueces, en todos los demás casos. No se admitirá fianza en estos últimos casos cuando el recurso entablado no plantee una cuestión sustancial o cuando la naturaleza del delito o el carácter y antecedentes penales del acusado aconsejen, a juicio del tribunal y para la protección de la sociedad, la reclusión del convicto mientras se ventile el recurso. No se admitirá fianza alguna en estos casos sin antes dar al fiscal de la sala correspondiente oportunidad de ser oído. Salvo situaciones de verdadera urgencia o cuando ello resultare impracticable, la solicitud de fianza deberá someterse en primer término al tribunal sentenciador y si éste la negare podrá presentarse al Tribunal Supremo o a uno de sus jueces, acompañada de copias certificadas de la solicitud hecha al tribunal sentenciador y de su dictamen, de una transcripción de la prueba, si se hubiere presentado alguna, y de un breve informe exponiendo las razones por las cuales se considera errónea la resolución."

Esta regla recoge la expresión de este Tribunal en *Pueblo v. Toro*, 81 D.P.R. 472 (1959), cuando a la pág. 476 reconocimos el propósito legislativo de "establecer un único sistema mediante el cual se reconozca la fianza como cuestión de derecho en todos los delitos menos graves (*misdemeanor*) y

como cuestión discrecional en todos los delitos graves (*felony*), excepto en los que se impone pena de reclusión perpetua." Ni el primer aspecto—fianza como cuestión de derecho luego de convicción por delito menos grave—ni la prohibición absoluta para conceder fianza en apelación luego de convicción por delito que apareja prisión perpetua, han sido motivo de controversia. Es sobre la fianza discrecional que se centran a diario las contiendas, basadas en la interpretación de los conceptos "cuestión sustancial", "naturaleza del delito", "carácter y antecedentes penales del acusado", y "protección de la sociedad", cuyos conceptos tiene que considerar el tribunal para el ejercicio de su discreción al conceder o negar la fianza en apelación.

No podrían establecerse reglas que definieran y redujesen cada uno de dichos conceptos a una mínima expresión. Tampoco podría señalarse la decisión en un determinado caso como precedente obligatorio puesto que la decisión en cada caso tiene necesariamente que depender de sus particulares hechos. Baste decir que esos conceptos, que hemos recogido del apartado (c) de la Regla 198 que comentamos, señalan en términos generales hacia dos fundamentales consideraciones a tenerse presentes cuando se solicita fianza en una causa apelada para ante este Tribunal. La primera se refiere a la sustancialidad de la cuestión planteada en el recurso. La segunda se refiere a la persona del acusado. En la primera han de examinarse los planteamientos en que se basa el ataque que en apelación habrá de hacerse al fallo del tribunal sentenciador y las probabilidades de éxito de ese ataque. En la segunda han de considerarse la naturaleza del delito y la peligrosidad del acusado para el orden social.

Al considerar ambas cuestiones debe tenerse en mente que el apartado (c) de la Regla 198 no ordena que en determinados casos se admita fianza en apelación. Por el contrario, luego de señalar que el tribunal tiene discreción para ello, prohíbe el ejercicio de esa discreción "cuando el recurso enta-

blado no plantee una cuestión sustancial o cuando la naturaleza del delito o el carácter y antecedentes penales del acusado aconsejen, a juicio del tribunal y para la protección de la sociedad, la reclusión del convicto mientras se ventile el recurso." Ante cualquiera de esas situaciones, la Regla 198 prohíbe la concesión de fianza. Así, no se admitirá fianza si el recurso no plantea una cuestión sustancial, independientemente de cuál sea la naturaleza del delito o el carácter y antecedentes del acusado. Tampoco se admitirá fianza si la naturaleza del delito o el carácter y antecedentes penales del acusado mueven al tribunal a concluir que el acusado constituye un peligro para la sociedad, independientemente de que el recurso pueda plantear una cuestión sustancial.

La Regla 198, en su apartado (c), confiere una doble facultad al Tribunal Supremo o a uno de sus jueces. Permite que pueda presentarse la solicitud de fianza ante este Tribunal en primera instancia, y da derecho al acusado a recurrir ante nosotros contra una decisión del tribunal sentenciador negándose a concederle fianza cuando la solicitud se hubiere presentado ante dicho tribunal en primer término. Nuestra jurisdicción original está limitada por la propia Regla a "situaciones de verdadera urgencia" o cuando "resultare impracticable" presentar la solicitud al tribunal sentenciador. Ese lenguaje limitativo constriñe nuestra jurisdicción en casos ordinarios a la función revisora. Así lo entendemos. (²)

Para poner a este Tribunal en condiciones de pasar sobre el dictamen del tribunal sentenciador, la Regla 198 requiere que la solicitud ante nos venga "acompañada de

---

(²) La Regla 198 es prácticamente idéntica al 374 del Código de Enjuiciamiento Criminal de 1935, 34 L.P.R.A. sec. 1215, hasta la parte que requiere que se oiga al fiscal antes de admitir fianza en apelación. El Art. 374 no contemplaba la revisión del dictamen del tribunal sentenciador, cuyo procedimiento ha sido adicionado por la última oración de la Regla 198. La Regla contempla, además, la concesión de fianza si el acusado entablare recurso de *certiorari* ante el Tribunal Supremo.

copias certificadas de la solicitud hecha al tribunal sentencia-
dor y de su dictamen, de una transcripción de la prueba, si
se hubiere presentado alguna, y de un breve informe expo-
niendo las razones por las cuales se considera errónea la
resolución." Siendo éstos los requisitos establecidos taxativa-
mente para ejercer este Tribunal su jurisdicción, habrán de
cumplirse estrictamente. *Pueblo* v. *Rubio*, 44 D.P.R. 889
(1933); *Gotay, Ex Parte, y El Pueblo*, 37 D.P.R. 472 (1927);
*Pueblo* v. *Dones*, 18 D.P.R. 277 (1912); *cf. Pueblo* v. *Váz-
quez*, 72 D.P.R. 824 (1951); *Pueblo* v. *Díaz*, 60 D.P.R. 844
(1942); *Pueblo* v. *Buscaglia*, 58 D.P.R. 921 (1941); *Pueblo*
v. *Martínez*, 53 D.P.R. 578 (1938); *Pueblo* v. *Bayrón*, 40
D.P.R. 818 (1930).

▆▆▆ Para que el tribunal sentenciador pueda estar en
condiciones de pasar sobre la sustancialidad del recurso de
apelación será necesario que los fundamentos en que se basa
se expongan en la moción en solicitud de fianza.([3]) Está im-
plícito además en la última oración de la Regla 198 que el
tribunal sentenciador viene obligado a celebrar una vista para
conocer sobre los méritos de la solicitud. El fiscal de la Sala
en que se hubiere celebrado el juicio tendrá derecho a interve-
nir en dicha vista, en la que podrá presentarse prueba, espe-
cialmente sobre el aspecto de "la naturaleza del delito o el
carácter y antecedentes penales del acusado."

▆▆▆ Una vez concluida la vista el tribunal sentenciador
deberá resolver por escrito sin dilación innecesaria. Su dicta-
men denegando la solicitud de fianza, deberá ser explícito
en su exposición, haciendo las determinaciones de hechos que

---

([3]) Distinto al procedimiento de revisión en casos civiles, en que se
exige que la petición exponga los fundamentos en que se apoya el recurso,
Regla 53.3 de Procedimiento Civil y Reglas 15 y 15.1 de nuestro Regla-
mento, la apelación en casos criminales se inicia mediante la presentación de
un lacónico escrito que "especificará el nombre o nombres de los acusados
apelantes; designará la sentencia de la cual se apela; y especificará que la
apelación se establece para ante el Tribunal Supremo." Regla 196 de Pro-
cedimiento Criminal.

la prueba desfilada durante la vista ameritaren y exponiendo los fundamentos por los cuales, a su juicio, la apelación carece de sustancialidad o la protección de la sociedad impide que el acusado permanezca en el seno de la comunidad, según fuere el caso. El dictamen deberá ser notificado prontamente al acusado y al fiscal. La Regla 198 no establece un término máximo dentro del cual el acusado podrá solicitar revisión a este Tribunal. No obstante, deberá hacerlo dentro de un término razonable considerando las circunstancias del caso.

En el caso ante nos las resoluciones del tribunal sentenciador son lacónicas. La primera se limitó a señalar que denegaba la solicitud de fianza "ya que la misma no plantea una cuestión sustancial de derecho y por la naturaleza del delito." (⁴) La segunda, un poco menos parca, señala que: "Habiendo resultado convicto el acusado por tres infracciones a la Ley de Drogas y Narcóticos de Puerto Rico, siendo uno de los cargos el de venta, entendemos que la naturaleza de dicho delito, *según la prueba desfilada*, aconsejan no fijar fianza en apelación para la protección de la sociedad." (⁵) (Énfasis nuestro.) Distan mucho ambas resoluciones de cumplir con los requisitos de un dictamen, según los hemos señalado. Por supuesto, no podemos culpar al tribunal sentenciador por no aplicar una norma que ahora establecemos.

Pasemos ahora a considerar la decisión de *United States ex rel. Keating* v. *Bensinger*, antes citado, que resolvió que la negativa de una corte del estado de Illinois a conceder fianza en apelación a un prisionero estatal, sin exponer fundamentos para tal negativa, constituyó una arbitrariedad en violación de las Enmiendas VIII y XIV de la Constitución de los Estados Unidos. La Corte de Distrito, por su juez Señor Will, se expresó así (322 F.Supp. a la pág. 787) :

---

(⁴)Resolución de 3 de noviembre de 1971, tomada del caso M-71-150 de este Tribunal.

(⁵)Resolución de 12 de abril de 1973.

"Explícitamente queremos señalar que no estamos resolviendo que no pueda existir una razón que justifique negar fianza al peticionario. Solamente concluimos que la decisión de la corte estatal negándose a conceder fianza sin exponer razones para ello *crea una presunción de arbitrariedad.* No estamos sosteniendo que un joven de 18 años de edad convicto de vender marihuana, que fue sentenciado a prisión por un término de diez a veinte años, y que no ha sido previamente convicto de delito grave tiene un derecho absoluto a fianza pendiente su apelación. Meramente concluimos que cuando una corte estatal niega la fianza *autorizada por la legislatura del estado* sin dar razones para sostener su negativa, el hecho de no indicar las razones que motivaron su negativa a conceder la fianza es de suyo una actuación arbitraria que viola las enmiendas VIII y XIV. Cualquier otra regla anularía en efecto la protección de esas enmiendas." (Énfasis nuestro.)

Respetamos el criterio expresado en el citado caso de *Bensinger,* pero no nos obliga, como no nos obligan las decisiones de ninguna corte federal, excepción hecha del Tribunal Supremo en casos apropiados. *Pueblo* v. *Pérez,* 59 D.P.R. 453, 455 (1941).(6) Los tribunales de última instancia en los esta-

---

(6) Cuando en *Pérez,* supra, no excluimos de la obligatoriedad de la jurisprudencia federal a la Corte de Apelaciones Para el Primer Circuito, lo hicimos en base a que entonces nuestras decisiones eran apelables, bajo determinadas circunstancias, para ante dicha Corte. 28 U.S.C. secs. 1293 y 1294. Dichas secciones fueron derogadas por la Ley Pública 87–189 del Congreso de fecha 30 de agosto de 1961, que a su vez adicionó la Sec. 1258 del título 28 del Código de Estados Unidos. La citada Sec. 1258 lee de la manera siguiente, adoptando la traducción de Equity Publishing Corporation, según aparece en la anotación que sigue a 4 L.P.R.A. sec. 31:

" 'Las sentencias o resoluciones finales dictadas por el Tribunal Supremo del Estado Libre Asociado de Puerto Rico podrán ser revisadas por el Tribunal Supremo como sigue:

'(1) Por apelación, cuando sea cuestionada la validez de un tratado o estatuto de los Estados Unidos y la decisión sea en contra de su validez.

'(2) Por apelación, cuando sea cuestionada la validez de un estatuto del Estado Libre Asociado de Puerto Rico sobre la base de ser opuesto a la Constitución, tratados o leyes de los Estados Unidos, y la decisión sea en favor de su validez.

'(3) Por *certiorari,* cuando la validez de un tratado o estatuto de los Estados Unidos sea cuestionada o cuando la validez de un estatuto del Estado Libre Asociado de Puerto Rico sea cuestionada sobre la base de ser

dos federados no han vacilado en rechazar la obligatoriedad para ellos de la jurisprudencia de las cortes federales, excepción hecha del Tribunal Supremo. Véanse *City of Chicago* v. *Loitz*, 295 N.E.2d 478, 482 (Ill.) (1973) ; *Kraus* v. *Board of Education of City of Jennings*, 492 S.W.2d 783, 784 (Mo.) (1973) ; *General Electric Co.* v. *State ex rel. Dept. of Public Works*, 32 Cal. App.3d 918, 108 Cal. Rptr. 543, 547 (1973). Este principio ha sido reconocido por las propias cortes federales. *United States ex rel. Lawrence* v. *Woods*, 432 F.2d 1072, 1076 (7th Cir. 1970), *certiorari* denegado 402 U.S. 983, 91 S.Ct. 1658, 29 L.Ed.2d 148.

Aun en los casos en que por razón de la dualidad jurisdiccional que impone el federalismo concurren los sistemas de cortes estatales y federales en la responsabilidad de proteger derechos garantizados por la Constitución federal, se han desarrollado doctrinas jurisprudenciales que limitan la intervención de las cortes federales en asuntos bajo consideración por las cortes estatales o en que se reconoce que éstas deben tener la primera oportunidad de intervenir. Tales doctrinas podrían resumirse en la conocida norma de abstención, desarrollada por el Tribunal Supremo federal en *Railroad Commission of Texas* v. *Pullman*, 312 U.S. 496 (1941), limitada luego en *Dombrowski* v. *Pfister*, 380 U.S. 479 (1965), y que ha vuelto a cobrar vigencia en las más recientes decisiones. *Younger* v. *Harris*, 401 U.S. 37 (1971) ; *Samuels* v. *Mackell*, 401 U.S. 66 (1971) ; *Boyle* v. *Landry*, 401 U.S. 77 (1971) ; *Pérez* v. *Ledesma*, 401 U.S. 82 (1971) ; *Dayson* v. *Stein*, 401 U.S. 200 (1971), y *Byrne* v. *Karalexis*, 401 U.S. 216 (1971), conocidos como "el sexteto Younger"; *Mitchum* v. *Foster*, 407 U.S. 225, 243 (1972) ; *O'Shea* v. *Littleton*, 94 S.Ct. 669 (1974), 42 U.S.L.W. 4139 (15 de enero de 1974). Tiene por

opuesto a la Constitución, tratados o leyes de los Estados Unidos, o cuando cualquier título, derecho, privilegio o inmunidad sea especialmente suscitado o reclamado bajo la Constitución, tratados o estatutos de, o prerrogativa asumida o autoridad ejercitada bajo, los Estados Unidos.' "

base la doctrina la promoción del federalismo limitando en lo posible las fricciones entre ambos sistemas, que han sido motivo de seria preocupación. ([7])

Si válidas fueron las razones en que nos basamos en *Pueblo v. Pérez,* supra, en 1941, para rechazar como precedentes obligatorios los dictámenes de cortes federales, y válidas son las razones de los estados para hacer igual rechazo, y válidos los fundamentos en que descansa la norma de abstención sentada por el Tribunal Supremo federal, mucho más fuerza cobran dichas razones cuando se consideran a la luz de la actual relación entre Puerto Rico y los Estados Unidos. Por un lado, la historia de las relaciones entre los

---

([7]) El Juez Presidente Warren, dirigiéndose al American Law Institute en 1958 expresó su preocupación sobre lo que llamó "el adecuado balance jurisdiccional entre los sistemas de cortes federales y estatales." Dyer, *State Trial Courts from a Federal Viewpoint,* 54 Judicature 372, 374 (1971). La misma preocupación ha sido expresada por el Juez Presidente Burger, quien en 1970 comentó: "La fricción en las relaciones entre las cortes estatales y federales presenta serios problemas tanto respecto de peticiones de confinados estatales como en otros casos." Dyer, citado *supra.* Véase Gaynor, *Federal Injunctions and State Criminal Prosecutions: Vestiges of "Our Federalism,"* 21 Clev.-St. L. Rev. (1), 165, 167 (1972).

Son numerosas las monografías y escritos en revistas jurídicas comentando la doctrina de abstención. Para mencionar algunas, véanse Maraist, *Federal Intervention in State Criminal Proceedings: Dombrowski, Younger and Beyond,* 50 Texas L. Rev. 1324 (1972); Comentario: *Federal Court Interference with State Criminal Proceedings—Some Recent Developments,* 24 U. Fla. L. Rev. 564 (1972); Comentario: *Federal Injunctive Relief Against State Court Criminal Proceedings: From Young to Younger,* 32 La. L. Rev. 601 (1972); Comentario: *I Used to Love You but It's All Over Now: Abstention and the Federal Courts' Retreat from Their Role as Primary Guardians of First Amendment Freedoms,* 45 So. Cal. L. Rev. 847 (1972); Sedler, *Dombrowski in the Wake of Younger: The View from Without and Within,* Vol. 1972 Wis. L. Rev., pág. 1; conferencia de la Juez de la Corte de Apelaciones para el Noveno Circuito, Hon. Shirley M. Hufstedler titulada *Comity and the Constitution: The Changing Role of the Federal Judiciary,* 47 N.Y.U. L. Rev. 841 (1972); Comentario, *The Abstention Doctrine: Some Recent Developments,* 46 Tul. L. Rev. 762 (1971); Schoenfeld, *American Federalism and the Abstention Doctrine in the Supreme Court,* 73 Dick. L. Rev. 605 (1969); Bell (Juez de la Corte de Apelaciones para el Quinto Circuito), *State Courts and The Federal System,* 21 Vand. L. Rev. 949 (1968).

estados y el gobierno federal revela una paulatina pero constante rendición de atributos de soberanía por parte de los estados a favor del gobierno federal. Por otra parte, la historia de las relaciones de Puerto Rico con los Estados Unidos revela una corriente opuesta. Adquirido por los Estados Unidos como una mera posesión, por cesión al terminar la Guerra Hispanoamericana, Puerto Rico ha evolucionado desde entonces hasta lograr una condición política de su propia hechura, concebida en virtud de un pacto libremente adoptado por nuestro pueblo, y basada en el principio de auto-determinación. Su condición política garantiza su autonomía local, y sus relaciones con los Estados Unidos están enmarcadas en el respeto mutuo, en el reconocimiento de nuestra dignidad de pueblo, y en el afecto fraternal ínsito en la común ciudadanía que nos une.

Desde antes de aprobarse la Constitución del Estado Libre Asociado se habían hecho pronunciamientos por el Tribunal Supremo federal que señalaban pautas de gran significación en cuanto a las relaciones de los poderes legislativo y judicial de Estados Unidos respecto de Puerto Rico. Se dijo en *Bonet* v. *Yabucoa Sugar Co.*, 306 U.S. 505, 510 (1938), citado en *García Mercado* v. *Tribunal Superior*, 99 D.P.R. 293, 305 (1970):

"Se sirve bien al desarrollo ordenado del Gobierno de Puerto Rico mediante una cuidadosa y consistente deferencia legislativa y judicial hacia los procedimientos y los tribunales de dicha Isla."

Esta norma, seguida en *Bonet* v. *Texas Co.*, 308 U.S. 463, 470–471 (1939), tiene mayor vigencia hoy ante la nueva relación surgida en virtud de la Ley Pública 600, 81er. Congreso, 64 Stat. 319, de 3 de julio de 1950. *Cf. Fornaris* v. *Ridge Tool Co.*, 400 U.S. 41 (1970); *District of Columbia* v. *Carter*, 409 U.S. 418, 424, escolio 11 (1972). Véase *Fournier* v. *González*, 80 D.P.R. 262, 269 (1958), donde dijimos:

"El propósito de la Ley 600 fue precisamente ampliar y no restringir los poderes y la autonomía de Puerto Rico sobre sus asuntos internos."

Para mayor abundamiento, bástenos reproducir el acopio de datos que recogimos en *García Mercado* v. *Tribunal Superior*, supra, a las págs. 301–303:

"El Congreso, el Tribunal Supremo, la Presidencia y los autores han reconocido la relación especial que desde el 1952, en virtud del pacto y de la Constitución de Puerto Rico, existe entre este país y los Estados Unidos. Los ejemplos de esto son numerosos pero nos limitaremos a mencionar sólo algunos que son representativos y eminentes:

1. Ley Pública 600 del 81er. Congreso, aprobada en 3 de julio de 1950, 64 Stat. 319, mediante la cual el Congreso con la aprobación del Presidente expresó que 'reconociendo ampliamente el principio del gobierno por consentimiento de los gobernados, se aprueba esta Ley, con el carácter de un convenio, de manera, que el pueblo de Puerto Rico pueda organizar un gobierno basado en una constitución adoptada por él mismo.'

2. Ley Pública 447 del 82do. Congreso, aprobada en 3 de julio de 1952, 66 Stat. 327, en la cual se expresa que la Ley 600 'fue adoptada por el Congreso como un convenio con el pueblo de Puerto Rico.'

3. (a) Memorando del Gobierno de los Estados Unidos, (b) carta del Representante de los Estados Unidos en las Naciones Unidas al Secretario General de dicho cuerpo de 21 de marzo de 1953, (c) carta del Gobernador de Puerto Rico al Presidente de 17 de enero de 1953 y otros documentos relacionados, 28 Dept. State Bull. (E.U.) 584.

4. Memorando del Presidente de los Estados Unidos sobre el Estado Libre Asociado de Puerto Rico dirigido a los jefes de los departamentos ejecutivos del Gobierno de los Estados Unidos, 26 Federal Register 6695 (1961), en el cual se dice lo siguiente: 'Debido a la importancia y significado de Puerto Rico en las relaciones de los Estados Unidos con la América Latina y con otras naciones, es esencial que los departamentos ejecutivos estén plenamente conscientes de la posición especial del Estado Libre Asociado y que las decisiones, los actos, los informes y toda otra

actividad que afecte al Estado Libre Asociado debe ser consistente con su estructura y sus principios básicos.'

5. Reconocimiento judicial de 'la relación especial (*unique*) que existe entre el Congreso y el Estado Libre Asociado de Puerto Rico.' *Katzenbach* v. *Morgan*, 384 U.S. 641, 658. En *Granville-Smith* v. *Granville-Smith*, 349 U.S. 1, 6, el Tribunal distinguió la situación actual de Puerto Rico de la anterior. Allí se refirió a la situación anterior al 1952 como 'pre-Commonwealth Puerto Rico.'

6. Ejemplos de aplicación local a Puerto Rico de leyes federales previo el consentimiento expreso de la Asamblea Legislativa de Puerto Rico: (a) Ley Pública Núm. 859 del 85to. Congreso y la Ley Núm. 3 de 6 de mayo de 1959, Leyes de Puerto Rico, Tercera Sesión Ordinaria, 1959, pág. 15, mediante la cual la Asamblea Legislativa de Puerto Rico dio su consentimiento para la aplicación en Puerto Rico de la Sec. 5314 del Código Federal de Rentas Internas de 1954, según enmendado por la Ley Pública 859 del Congreso; (b) la Resolución Conjunta Núm. 97 de 22 de junio de 1956 (R. C., 1956, pág. 245) dando consentimiento para la aplicación en Puerto Rico de un tributo sobre elaboración de azúcar refinada impuesto por la Ley de Azúcar de 1948, Ley Pública 545 del Congreso, de 29 de mayo de 1956; (c) Resolución Conjunta Núm. 1 de 25 de julio de 1956 de la Asamblea Legislativa de Puerto Rico (R. C., 1956, pág. 335) dando consentimiento para que las Secs. 4701 a 4707 y 4771 a 4776 del Código Federal de Rentas Internas de 1954, según enmendado, se apliquen a Puerto Rico a partir de la fecha de vigencia de la Ley Pública 728 del 84to. Congreso.

7. McGruder, [*sic*] *The Commonwealth Status of Puerto Rico*, 15 U. Pitt. L. Rev. 1 (1953); Friedrich, *Puerto Rico: Middel* [*sic*] *Road to Freedom* (1959); Wells, *The Modernization of Puerto Rico*, Harvard University Press (1969), págs. 220–241; Cancio, Chief Judge, U.S. Dist. Ct. for P.R., *The Power of the Congress to Enter into a Compact with the People of Puerto Rico: The Legal Status of the Compact*, 22 Rev. C. Abo. P.R. 341 (1962). Para una relación mayor de libros, documentos oficiales y artículos sobre el Estado Libre Asociado de Puerto Rico véase el Apéndice del caso *E.L.A.* v. *Márquez*, 93 D.P.R. 393, 408 (1966).

La Sec. 9 de la Ley de Relaciones Federales entre los Estados Unidos y Puerto Rico dispone que:

'Las leyes estatutarias de los Estados Unidos *que no sean localmente inaplicables,* salvo lo que en contrario se dispusiere en la presente, tendrán el mismo efecto y validez en Puerto Rico que en los Estados Unidos. . . .' (Énfasis nuestro.)

Y en lo que respecta a cuestiones marítimas en particular, el Congreso dispuso en la Sec. 8 de dicha Ley de Relaciones Federales que:

'Todas las leyes de los Estados Unidos para la protección y mejoramiento de las aguas navegables de los Estados Unidos y para la conservación de los intereses de la navegación y del comercio, serán aplicables a dicha isla y aguas y a sus islas y aguas adyacentes, *excepto en aquello en que las mismas sean localmente inaplicables; . . . .'* (Énfasis nuestro.) 48 U.S.C. Sec. 749."

Aparte de que, como hemos señalado, no estamos obligados por lo resuelto en *United States ex rel. Keating* v. *Bensinger,* supra, la presunción que allí se pretende crear es inaceptable para nosotros. [8] Las presunciones, a diferencia de las inferencias, son mandatos de ley. Art. 98 de la Ley de Evidencia, 32 L.P.R.A. sec. 1883; 1 Jones *On Evidence* sec. 9 (1958); 1 Wharton's *Criminal Evidence* sec. 90 (1972); IX Wigmore *On Evidence* sec. 2490 (1940). Entre las presunciones más importantes en nuestro sistema de Derecho están la de regularidad en el cumplimiento de un cargo y la de que la ley ha sido acatada. Art. 102 de la Ley de Evidencia, incisos 15 y 32, 32 L.P.R.A. sec. 1887. Si aplicables a la conducta de los individuos, con mucha más razón son válidas estas presunciones cuando se trata de actuaciones judiciales. Véanse *Pueblo* v. *González Rivera,* 88 D.P.R. 205, 207 (1963); *Escalera* v. *Armenteros,* 74 D.P.R. 11 (1952); *Johnson* v. *Zerbst,* 304 U.S. 458, 468; 82 L.Ed. 1461, 1468; *Re Cuddy,*

---

[8] Es interesante notar que cinco meses después de la decisión del caso *Bensinger,* se resolvió por la misma corte el caso de *Davis* v. *Supreme Court of the State of Illinois,* Núm. 71 c 925 (D.C.N.D. Ill., 15 de junio de 1971), en que bajo una situación factual similar se negó dicha corte a aplicar la doctrina de *Bensinger.*

131 U.S. 280, 33 L.Ed. 154; 1 Wharton's *Criminal Evidence*, sec. 129. Se desmoronaría la fe en la justicia si llegase el momento en que las cortes se vieran obligadas a probar que actúan con rectitud, con sentido de responsabilidad, y en acatamiento de la ley. Es sabia la presunción que protege la legalidad, colocando el peso de la prueba en quien alegue arbitrariedad en la actuación de un tribunal de justicia. Ciertamente no hay base factual alguna en Puerto Rico en que hacer descansar la insólita presunción de arbitrariedad establecida en *Bensinger*. Adoptarla o aplicarla aquí sería ofender la tradición de limpieza y honestidad moral e intelectual de que justificadamente se enorgullece la judicatura puertorriqueña.

 Este Tribunal no está obligado a dar en todos los casos las razones que explican sus dictámenes. Lo hace en aquellos casos que lo ameritan. No tiene obligación de hacerlo y no lo hará en aquellos asuntos que por su propia frivolidad y por su carencia de méritos no justifican el empleo de tiempo y esfuerzo que bien puede dedicar a aquellas cuestiones fundamentales y de importancia normativa que demandan toda su energía creadora. ([9])

Reexaminado el caso de autos a la luz de los conceptos aquí vertidos, vista la transcripción del incidente sobre fianza en apelación ante el tribunal sentenciador, que revela suficientes bases factuales y legales para sostener su decisión, y vistos los escritos del acusado aquí peticionario y los informes del Procurador General concluimos que no debemos intervenir

---

([9]) Esta no es la primera expresión que emana de este Tribunal sobre este particular. En un voto concurrente en *Pueblo* v. *Cortés Burgos*, 100 D.P.R. 933, 934 (1972), se expresó así el entonces Juez Asociado Señor Martínez Muñoz acerca de la norma establecida en *Bensinger*:

"Esta norma es lesiva a la dignidad de los tribunales estatales. No será ésta la única ni la más importante ocasión en que la ley sanciona el que un tribunal haga ciertas determinaciones sin expresar razones; considérese, por ejemplo, que los tribunales apelativos pueden negarse a expedir autos como el de revisión o *certiorari* sin expresar razones ni celebrar vista y que los tribunales (o jurados) normalmente no expresan conclusiones de hecho [*sic*] o de derecho cuando declaran culpable a un acusado."

con la discreción ejercida ni alterar el dictamen del tribunal sentenciador. Tampoco tenemos que abundar en más razones para explicar nuestra decisión.

Considerada la moción del peticionario como una segunda moción de reconsideración *se dictará resolución decretando no ha lugar a la misma y ratificando la resolución de 2 de mayo de 1973 por virtud de la cual se declaró sin lugar la Solicitud de Mandamus o Moción Solicitando Fianza en Apelación.*

El Juez Asociado, Señor Martín, concurre con el resultado y emitirá un voto separado.