EL PUEBLO DE PUERTO RICO, apelado, *v.* LUIS ENRIQUE REYES MORÁN, acusado y apelante.

*Número:* CR-83-78        *Resuelto:* 15 de junio de 1989

*Margarita Carrillo*, de la *Sociedad para Asistencia Legal, División de Apelaciones*, y *Víctor A. Meléndez Lugo*, abogados del apelante; *Roberto Schmidt Monge, Procurador General*, y *Marjorie Rivera Rodríguez, Procuradora General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

El apelante fue acusado de cometer el delito de robo. Art. 173 del Código Penal, 33 L.P.R.A. sec. 4279. Además, en la acusación el fiscal le imputó delincuencia habitual por haber sido sentenciado y convicto anteriormente en dos (2) ocasiones por los delitos de robo, tentativa de escalamiento agravado, apropiación ilegal agravada y escalamiento agravado. A esos efectos, la acusación indicaba los delitos por los cuales había sido declarado convicto anteriormente.

El apelante renunció a su derecho a juicio por jurado, aceptó la alegación de delincuente habitual e hizo alegación de no culpable del delito imputado.

El tribunal lo encontró culpable del delito de robo y lo condenó a veinte (20) años de prisión, conforme a lo dispuesto en el Art. 74 del Código Penal, según enmendado, 33 L.P.R.A. ant. sec. 3375.

## I

El Sr. Juan Montañez es taxista y, para el 21 de marzo de 1982, estaba trabajando a altas horas de la noche en un sector de la Avenida Barbosa cerca de Río Piedras. Como a eso de las 3:30 A.M. recogió a un pasajero —quien luego resultó ser el acusado— a quien describió como trigueño, de baja estatura, de bigote y barba, y con muchas cicatrices en ambos brazos. En ese momento, el acusado no le indicó al chofer un lugar específico a donde quería ir, sino que lo dirigía mientras éste conducía el taxi. Durante el trayecto, el acusado le ofreció en venta al señor Montañez unos televisores que, según le indicó, se había robado de un muelle en San Juan. También le mencionó que le incomodaba una pistola calibre veinticinco (25) que siempre portaba consigo. Finalmente, el acusado dirigió el taxi hasta una calle sin salida del Residencial Ernesto Ramos Antonini. Una vez allí, le indicó al señor Montañez que tenía seis (6) dólares para pagarle, pero que no se los iba a dar porque quería que le cambiara un billete de veinte (20) dólares. El acusado no le mostró el billete de veinte (20) dólares, pero insistió en que se lo cambiara, pues de lo contrario le iba "a pegar dos tiros". Luego de este intercambio, el acusado apagó el motor del vehículo, sacó la llave del encendido y le ordenó al señor Montañez que le entregara el dinero que tenía. Éste le entregó un billete de veinte (20) dólares que tenía guardado en el bolsillo de su camisa. El acusado también tomó unos treinta y cinco (35) dólares de la guantera del automóvil.

El incidente ocurrido en el residencial tomó unos cinco (5) minutos y, durante todo el tiempo, el taxista pudo obser-

var al acusado, ya que la luz interior del vehículo estuvo encendida.

Después de ocurridos los sucesos, el señor Montañez se encaminó a la Avenida Barbosa en busca de un agente de la Policía que le pudiera ayudar. Al poco tiempo apareció una patrulla. El señor Montañez le informó a los policías todo lo ocurrido y éstos anotaron los datos y llamaron por radio a otras patrullas para que realizaran una ronda por el sector. Tanto las patrullas como el señor Montañez circundaron el área cercana a donde ocurrieron los hechos, pero no pudieron localizar al acusado.

Unas tres (3) semanas después, el señor Montañez vio al acusado en un restaurante de Isla Verde y, al percatarse de ello, salió inmediatamente a buscar la asistencia de la Policía. Cerca del lugar encontró dos (2) oficiales del orden público que rehusaron ayudarlo porque, según indicaron, "eso 'era cosa del C.I.C.'". Alegato del apelante, pág. 63.

El 28 de abril de 1982 el señor Montañez volvió a ver al acusado, esta vez en la Avenida Ashford de Santurce. Inmediatamente se dirigió al Cuartel de la Policía ubicado en la Parada 19. Allí le informó al policía Vargas todo lo sucedido durante la madrugada del 21 de marzo. El señor Montañez y el policía Vargas se dirigieron, junto a otras patrullas, al lugar donde aquél había visto al acusado. Al llegar al lugar, el señor Montañez lo identificó y el policía Vargas lo arrestó.

Durante el juicio, la defensa presentó como prueba el testimonio del acusado. Éste declaró *únicamente* respecto a las cicatrices de sus brazos. De acuerdo con su declaración y con la observación que consta en récord, surge que el acusado tiene dos (2) cicatrices grandes y unas quince (15) cicatrices pequeñas en su brazo izquierdo, así como un tatuaje multicolor de forma rectangular en su antebrazo derecho.

El 17 de septiembre de 1982 el tribunal declaró al acusado culpable de delito de robo. Luego de que el juez emitiera su fallo condenatorio, la defensa solicitó al tribunal que

ordenase una evaluación siquiátrica del acusado con miras a determinar si poseía las características de un delincuente habitual. El fiscal se opuso. El tribunal se reservó su dictamen y el pronunciamiento de la sentencia hasta tanto las partes sometieran sus posiciones por escrito. Luego de que ambas partes sometieran sus memorandos de derecho y de varios trámites interlocutorios, el tribunal declaró al acusado "delincuente habitual" y lo sentenció a cumplir un término de reclusión de veinte (20) años.

En apelación, el acusado alega que el tribunal cometió los errores siguientes:

[1.] Se vulneró el derecho a gozar de la presunción de inocencia al estimar el Ilustre Magistrado de instancia que la prueba presentada por la defensa venía obligada a controvertir la prueba de cargo.

[2.] Erró la Ilustre Sala de instancia al declarar culpable al acusado a base de una prueba que no controvirtió la presunción de inocencia ni estableció su culpabilidad más allá de duda razonable.

[3.] Se menoscabó el derecho al debido proceso de ley al decretarse al acusado delincuente habitual sin habérsele permitido controvertir la presunción establecida en el artículo 74 del Código Penal.

[4.] Incidió la Honorable Sala de instancia al decretar delincuente habitual al acusado sin habérsele concedido los beneficios de los artículos 68 y 69 del Código Penal a pesar de que las referidas disposiciones estuvieron en vigor en un período anterior a la fecha en que se le sentenció. Alegato del apelante, págs. 6–7.

## II

No le asiste la razón al apelante.

En el primer señalamiento de error, el apelante alega que el tribunal invirtió el peso de la prueba al sostener que la defensa no había controvertido la prueba de cargo. A su juicio, dicha actuación menoscabó la presunción de inocencia de

que goza todo acusado. Este argumento es patentemente frívolo.

Según surge de la minuta de la vista celebrada el 17 de septiembre de 1982, luego de terminada la vista en su fondo, el tribunal manifestó que la prueba de cargo demostró la culpabilidad del acusado más allá de duda razonable. El tribunal apreció la prueba de cargo y declaró al acusado culpable a base de dicha prueba. No surge de los autos que el tribunal haya invertido el peso de la prueba.

### III

En el segundo señalamiento de error, el apelante sostiene que la prueba de cargo estuvo plagada de contradicciones y omisiones, y que la misma no demostró su culpabilidad más allá de duda razonable.

En reiteradas ocasiones hemos manifestado que, en ausencia de pasión, prejuicio o error manifiesto, este Tribunal no intervendrá con el veredicto de culpabilidad emitido por el juzgador de los hechos. *Pueblo v. Rivera Robles*, 121 D.P.R. 858 (1988); *Pueblo v. Rivero, Lugo y Almodóvar*, 121 D.P.R. 454 (1988); *Pueblo v. Mendoza Lozada*, 120 D.P.R. 815 (1988); *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986); *Pueblo v. Borrero Robles*, 113 D.P.R. 387 (1982); *Pueblo v. Millán Meléndez*, 110 D.P.R. 171 (1980); *Pueblo v. López Pérez*, 106 D.P.R. 584 (1977). La razón de esta norma es obvia: es el juzgador de los hechos quien puede apreciar el comportamiento del testigo al momento de declarar en el juicio. *Ortiz v. Cruz Pabón*, 103 D.P.R. 939 (1975); *Pueblo v. Rivero, Lugo y Almodóvar*, supra; *Pueblo v. Cabán Torres*, supra.

En este caso no encontramos razón alguna para apartarnos de esas normas e intervenir con la apreciación de la prueba. La misma está ampliamente sostenida por los testimonios presentados ante el tribunal de instancia. El Ministerio Público probó en el juicio todos los elementos del delito

de robo. El apelante no nos ha demostrado la existencia de prejuicio, pasión o error manifiesto en la determinación del tribunal de instancia.

■ Un análisis minucioso de la exposición narrativa de la prueba, de los autos y de la prueba documental demuestra que la prueba de cargo contenía algunas contradicciones y omisiones que no afectan la disposición final del recurso. Éstas no son de tal naturaleza que causen "en nuestro ánimo una insatisfacción o intranquilidad de conciencia tal que se estremezca nuestro sentido básico de justicia . . .". *Pueblo v. Cabán Torres*, supra, pág. 648; *Pueblo v. Rivero, Lugo y Almodóvar*, supra; *Pueblo v. Mendoza Lozada*, supra. Las omisiones y contradicciones versan sobre detalles secundarios que no afectan la prueba esencial de cargo. *Pueblo v. Espinet Pagán*, 112 D.P.R. 531 (1982). Vista en su totalidad y en la forma más favorable al acusado, la misma era suficiente para sostener el fallo condenatorio.

## IV

El apelante alega en su tercer señalamiento de error que el Art. 74 del Código Penal, *supra*, es inconstitucional por razón de que establece una presunción incontrovertible contra un acusado. Para que sea válida la presunción, según alega, debe permitírsele controvertirla mediante la celebración de una vista a esos efectos. En esencia, el apelante arguye que el Art. 74 del Código Penal, *supra*, viola el debido proceso de ley en la medida que autoriza la privación de su libertad a base de una presunción que no guarda un nexo racional entre el hecho presumido y el hecho básico.

En nuestra reciente opinión de *Pueblo v. Mattei Torres*, 121 D.P.R. 600 (1988), no se planteó, ni tuvimos la oportunidad de discutir, la constitucionalidad del Art. 74 del Código Penal, *supra*. Ahora lo hacemos.

Prácticamente todos los estados de Estados Unidos tienen un estatuto de delincuencia habitual dentro de su cuerpo de normas jurídicas. T.J. Moran, *Separation of Powers and the Illinois Habitual Offender Act: Who Sentences the Habitual Criminal?* 13 (Núm. 4) Loy. U. Chi. L.J. 1033 (1982). También, en la legislación criminal federal. *Spencer v. Texas*, 385 U.S. 554 (1967); 18 U.S.C. sec. 2114. Este tipo de estatuto ha existido por mucho tiempo en Inglaterra y en Estados Unidos. En algunos estados de la unión norteamericana se remontan hasta el 1796. *Graham v. West Virginia*, 224 U.S. 616 (1912). La mayoría de los estatutos son similares en su esencia, aunque varía el número y la gravedad de los delitos que deben ser cometidos antes de que una persona pueda ser convicta como delincuente habitual. Moran, *op. cit.*, págs. 1034–1035.

Los estatutos de delincuencia habitual persiguen distintos propósitos. En algunas jurisdicciones se persigue el propósito de disuadir a posibles delincuentes reincidentes; en otras, se persigue lograr la rehabilitación del delincuente múltiple, el de separarlo de la sociedad como medida de protección social o el de proveer una medida de retribución para con la sociedad. Ch.W. Sorenson, Jr., *The Habitual Criminal Act: Quantity of convictions Only?*, 59 (Núm. 1) Neb. L. Rev. 507 (1980). Sin embargo, en la mayoría de las jurisdicciones el propósito es el de establecer una *penalidad adicional* para el delincuente múltiple, es decir, el de penalizar la repetición de conducta delictiva. *Graham v. West Virgina*, supra; *Spencer v. Texas*, supra; *Rummel v. Estelle*, 445 U.S. 263 (1980); Sorenson, *supra*; *State v. Pierce*, 283 N.W.2d 6 (Neb. 1979).

Los estatutos de delincuencia habitual han resistido todo tipo de ataque bajo la constitución federal al amparo de las cláusulas de debido proceso de ley, igual protección de. las leyes, aplicación retroactiva de las leyes, castigos crueles e inusitados, doble exposición y privilegios e inmunidades. So-

renson, *supra*; *Rummel v. Estelle*, supra; *Spencer v. Texas*, supra; *Oyler v. Boles*, 368 U.S. 448 (1962); *Gryger v. Burke*, 334 U.S. 728 (1948); *Graham v. West Virginia*, supra; *Mc-Donald v. Massachusetts*, 180 U.S. 311 (1901); *Moore v. Missouri*, 159 U.S. 673 (1895).

El Tribunal Supremo de Estados Unidos ha mantenido un alto grado de deferencia sobre la facultad de las legislaturas estatales para definir las acciones que serán consideradas como delito y para prescribir las penalidades de dichas acciones dentro de sus jurisdicciones. *McMillan v. Pennsylvania*, 477 U.S. 79 (1986); *Solem v. Helm*, 463 U.S. 277 (1983); *Rummel v. Estelle*, supra. Dicho Tribunal ha sostenido que los estados tienen un interés válido en penalizar a aquellas personas que demuestran, a través de conducta delictiva repetida, una persistente tendencia a delinquir y a comportarse contrario a las normas de convivencia social. Al efecto, el Tribunal se ha expresado en los términos siguientes:

. . . . es además el interés, según se expresa en todas las leyes sobre delincuencia habitual, de castigar de una manera más severa a aquellos que con su conducta delictiva repetitiva han demostrado que simplemente no están capacitados para adaptarse a las reglas sociales establecidas por su estatuto penal. (Traducción nuestra.) *Rummel v. Estelle*, supra, pág. 276.

Hoy no se cuestiona la facultad de los estados para aprobar estatutos de delincuencia habitual. *Spencer v. Texas*, supra; *Rummel v. Estelle*, supra; *Oyler v. Boles*, supra. A esos efectos, el Tribunal Supremo de Estados Unidos manifestó que

. . . ya no se puede impugnar seriamente la constitucionalidad de la práctica de imponer penas más severas a los delincuentes habituales. (Traducción nuestra.) *Oyler v. Boles*, supra, pág. 451.

■ Debe indicarse que los criterios para definir un delincuente habitual y la penalidad que le habrá de ser im-

puesta son asuntos que competen a las jurisdicciones estatales. *Rummel v. Estelle*, supra, pág. 285. La Legislatura de Puerto Rico tiene amplia facultad para crear delitos e imponer castigos en ausencia de limitaciones constitucionales. *Pueblo v. Hickock of P.R., Inc.*, 78 D.P.R. 392 (1955); *Pueblo v. Martínez Torres*, 116 D.P.R. 793 (1986); *Pueblo v. Pérez Zayas*, 116 D.P.R. 197 (1985).

En el caso de autos, la convicción del apelante bajo el Art. 74 del Código Penal, *supra*, no viola la cláusula del debido proceso de ley de nuestra Constitución, pues al acusado se le garantizaron todos los requisitos procesales de dicho proceso. La ordenación de una penalidad adicional para quien ha sido convicto en más de dos (2) ocasiones es parte de las prerrogativas constitucionales de la Asamblea Legislativa.

La Asamblea Legislativa puede imponer a los delincuentes habituales una penalidad mayor dentro de la autoridad que constitucionalmente le asiste para imponer castigos. Ello no viola la cláusula contra castigos crueles e inusitados. Art. II, Sec. 12, Const. E.L.A., L.P.R.A., Tomo 1.

El fundamento para tratar al delincuente habitual como una categoría sujeta a una penalidad adicional es que su conducta demuestre que las penas que le fueron impuestas anteriormente no han tenido efecto disuasivo o rehabilitador alguno. D. Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General*, Hato Rey, Ed. Inst. Desarrollo del Derecho, 1983, págs. 331–332. Ello no hace del Art. 74 del Código Penal, *supra*, un castigo cruel e inusitado.

Sobre ese respecto, la posición que ha adoptado el Tribunal Supremo de Estados Unidos al analizar alguna legislación sobre las disposiciones sobre castigos crueles e inusitados es la siguiente:

"[L]a cláusula contra los castigos crueles e inusitados circunscribe el proceso penal de tres maneras: primero, limita los tipos de castigo que pueden imponerse a aquellas personas convictas de delitos, e.g., *Estelle v. Gamble* [429 U.S. 97 (1976)], *Trop v. Dulles*, supra; segundo, proh[í]be castigos altamente desp[ro]porcionados a la severidad del delito, e.g., *Weems v. United States, supra*; y tercero, le impone límites sustantivos a lo que puede ser un delito y la pena, [*e.g.*] *Robinson v. California*, supra . . . . El propósito primario de la cláusula contra castigos crueles e inusitados ha sido siempre considerado, y apropiadamente así ha sido, como uno dirigido al método o al tipo de castigo impuesto por la violación de delitos . . . ." (Escolio omitido.) D. Nevares-Muñiz, *La sentencia determinada, aspectos constitucionales*, 43 (Núm. 3) Rev. C. Abo. 421, 424 (1982).

Aunque la penalidad máxima de noventa y nueve (99) años naturales dispuesta por el Art. 74 del Código Penal, *supra* (delincuencia habitual) parezca altamente punitiva, el Tribunal Supremo de Estados Unidos validó en el caso de *Rummel v. Estelle*, supra, la imposición al convicto de una penalidad de cadena perpetua según el estatuto de Texas, similar al nuestro. En dicho caso el convicto había cometido tres (3) delitos graves, los cuales no eran de naturaleza violenta. De hecho, el último delito constituía una apropiación por medios fraudulentos de $120.75. Nevares-Muñiz, *op. cit.*, pág. 332.

## V

A los fines de colocar en adecuada perspectiva el Art. 74 del Código Penal, *supra*, y el concepto de delincuente habitual, examinamos la trayectoria histórica del mismo, así como de los conceptos de medidas de seguridad y de reincidencia presentes en nuestro ordenamiento penal.

El anterior Art. 74 del Código Penal, *supra*, según enmendado, relativo a la delincuencia habitual vigente cuando se sentenció al apelante y cuando éste cometió los actos que dieron lugar a la misma, disponía que:

El convicto de delito grave que anteriormente hubiere sido sentenciado por dos o más delitos graves cometidos en tiempos diversos e independientes unos de otros, se *presume que demuestra una persistente tendencia a delinquir, y será declarado por el tribunal delincuente habitual* y recluido para su tratamiento por un término fijo que no será nunca menor de veinte (20) años ni mayor de noventa y nueve (99) años. El término fijo que se imponga será siempre en años naturales. (Énfasis suplido.)

■ La Ley Núm. 115 de 22 de julio de 1974 (33 L.P.R.A. sec. 3001 *et seq.*), al adoptar el Art. 74 del Código Penal, *supra* —sobre "delincuente habitual"— lo colocó dentro del capítulo correspondiente a las medidas de seguridad. 1974 Leyes de Puerto Rico 471–472. *En ese momento*, el legislador concibió la disposición de delincuente habitual como una medida dual de seguridad y de reincidencia. El propósito del artículo iba dirigido tanto a la consecución de la rehabilitación del convicto como a separar de la sociedad a aquellos que representaban un riesgo para la comunidad. Por ello, el artículo proveía la reclusión del convicto hasta que éste lograra su readaptación social.[1]

Según el esquema proyectado, era necesario una evaluación psicológica de la personalidad del acusado para así poder determinar si la persona era un delincuente habitual que demostraba una persistente tendencia a delinquir y, también, para imponer la penalidad conforme a las características individuales del delincuente habitual. P. del S. 581 de

---

[1] Art. 74 del Código Penal:

"El convicto de delito sancionado con pena de reclusión que anteriormente hubiere sido sentenciado por dos o más delitos sancionados con esa clase de pena, cometidos en tiempos diversos e independientes unos de otros y que demostrare una persistente tendencia a delinquir, será declarado por el Tribunal delincuente habitual y recluido para su tratamiento hasta lograr su readaptación social.

"El máximo de esta reclusión no podrá exceder del máximo legal previsto para el delito cometido aumentado hasta el doble, y su mínimo no será nunca menor de tres años en los delitos graves, ni menor de seis meses en los delitos menos grave." 1974 Leyes de Puerto Rico 471–472.

1967; Informe de la Comisión de lo Jurídico Penal del Senado sobre el P. del S. 753 de 17 de junio de 1974; *Nuevo Código Penal y sus comentarios—Ley Número 115 de 22 de julio de 1974*, 36 (Núm. 1) Rev. C. Abo. P.R. 1 (1975); D. Nevares-Muñiz, *Código Penal de Puerto Rico: revisado y comentado*, San Juan, Ed. Rev. C. Abo. P.R., 1986; J. Suárez Morales, *De la reincidencia y la habitualidad: su estado en la ley penal vigente y en la proyectada*, 37 (Núm. 3) Rev. Jur. U.P.R. 559 (1968); F. Pagán Rodríguez, *Las medidas de seguridad en el Proyecto de Código Penal*, Año VII (Núm. 28) Rev. Der. Pur. 343 (1968).

Cabe advertir que al aprobarse el Código Penal en 1974 se pospuso la vigencia del Art. 74 del Código Penal, *supra*, por el término de un (1) año. Con la aprobación de la Ley Núm. 146 de 3 de julio de 1975 (33 L.P.R.A. sec. 4628), la Asamblea Legislativa pospuso nuevamente la vigencia del Art. 74. *Sin embargo, estando así pospuesta, el legislador aprobó la Ley Núm. 10 de 1ro de diciembre de 1975 (33 L.P.R.A. sec. 3301). Esta medida activó la disposición sobre delincuente habitual en su aspecto de medida punitiva de reincidencia. La ley excluyó, sin embargo, los elementos de medidas de seguridad contenidos en el Art. 74 del Código Penal, 1974 Leyes de Puerto Rico 471–472. Además, adicionó el Art. 74A, 33 L.P.R.A. sec. 3375a, sobre las normas de determinación de reincidencia.*

Llegado el 21 de julio de 1977, la Asamblea Legislativa aprobó la Ley Núm. 17 (33 L.P.R.A. sec. 4628), que pospone por dos (2) años adicionales la vigencia de los artículos del Código Penal correspondientes a las medidas de seguridad.

El 18 de junio de 1979, mediante la Ley Núm. 76 (1979 Leyes de Puerto Rico 165), la Legislatura pospuso nuevamente por dos (2) años adicionales la vigencia de los Arts. 59, 66, 67, 68, 69, 70, 71, 72, 73, 75 y 76. *Un examen cuidadoso de dicha ley demuestra que la misma dejó en pleno vigor el*

*Art. 74 del Código Penal,* supra, *como medida de reinciden-cia.*

Llegado el 1980, la Asamblea Legislativa estableció en Puerto Rico un sistema de sentencia determinada. Dentro del proceso necesario de ajustes y enmiendas para conformar el Código Penal con dicho sistema, *el legislador suprimió del texto original del Art. 74 del Código Penal, 1974 Leyes de Puerto Rico 471, la expresión "hasta lograr su readaptación social". De esta forma reafirmó aún más el cambio que iniciara en 1975, dirigido a suprimir del Art. 74,* supra, *según enmendado, el elemento de medida de seguridad y a constituirlo en una medida pura de reincidencia.*

El 9 de junio de 1981 se aprueba la Ley Núm. 8 para posponer nuevamente por dos (2) años adicionales la vigencia de las medidas de seguridad. No es sino hasta 1983 que, frente al historial previo de reiteradas posposiciones, el legislador decide poner en operación *todas* las medidas de seguridad mediante la Ley Núm. 26 de 25 de septiembre de 1983. A esos efectos, dispuso que los Arts. 59, 66, 67, 68, 69 y 71 del Código Penal, 33 L.P.R.A. secs. 3283, 3351–3354 y 3372, entrarían en vigor el 22 de septiembre de 1984; los Arts. 75 y 76 del Código Penal, 33 L.P.R.A. secs. 3391 y 3392, el 22 de julio de 1985, y los Arts. 72 y 73 del Código Penal, 33 L.P.R.A. secs. 3373 y 3374, el 22 de julio de 1988.

Nótese que en el historial legislativo de la ley el legislador se refiere a *todas* las medidas de seguridad *sin hacer mención alguna del Art. 74 del Código Penal,* supra, *según enmendado. Ello es indicativo de que el legislador una vez más concebía este Art. 74 como una medida pura de reincidencia y no como una medida de seguridad.*

Resulta muy ilustrativo el informe redactado por la Comisión de lo Jurídico del Senado sobre el P. del S. 1367 de 11 de marzo de 1988.

En dicho informe se señala expresamente que, aunque originalmente se había aprobado el Art. 74 del Código Penal,

1974 Leyes de Puerto Rico 471–472, como una medida mixta de reincidencia y de seguridad, la legislación posterior la convirtió en una medida pura de reincidencia. De esa forma, bastaba que existieran dos (2) convicciones previas por delitos graves para que la persona pudiera ser declarada delincuente habitual.

Mientras estaba pendiente ante nos este recurso de apelación, la Asamblea Legislativa derogó el Art. 74 del Código Penal, *supra*, según enmendado, mediante la Ley Núm. 34 de 31 de mayo de 1988 (33 L.P.R.A. secs. 3301–3302, 3351–3352 y 3391–3392). Dicha ley crea tres (3) categorías de reincidencia, entre las cuales incluye la reincidencia habitual. Conforme a la misma, la persona que es declarada reincidente habitual por haber cometido determinados delitos deberá ser sentenciada a cumplir una condena de separación permanente de la sociedad. Una vez el convicto haya cumplido treinta (30) años naturales de reclusión, quedará bajo la jurisdicción de la Junta de Libertad bajo Palabra conforme los términos de dicha ley. La exposición de motivos del estatuto refleja la honda preocupación del legislador por el aumento alarmante en la criminalidad y el efecto de los criminales reincidentes en la vida comunitaria. Dicha exposición de motivos declara lo siguiente:

> La criminalidad es uno de los problemas que más preocupa al Pueblo de Puerto Rico. El azote del crimen ha llegado a cobrar dimensión tal que ha restringido marcadamente el ámbito de libertad de la cuidadanía con grave menoscabo al disfrute de la vida a que tienen perfecto derecho todos los ciudadanos.
>
> Ante tal circunstancia, el Gobierno tiene la responsabilidad de penar con mayor severidad al convicto que recurre en la delincuencia tanto como medida punitiva como de protección social y de disuación.
>
> Para proteger a la sociedad puertorriqueña de los delincuentes reincidentes y habituales se aprueba esta legislación. Exposición de Motivos de la Ley Núm. 34 de 31 de mayo de 1988, Leyes de Puerto Rico, pág. 137.

■ *Con una trayectoria y un historial legislativo tan diáfano y firme, es claro que desde 1975 el Art. 74 del Código Penal,* supra, *según enmendado, ha sido una medida pura punitiva de reincidencia,* según expresamos en *Pueblo v. Mattei Torres,* supra, *con excepción de los elementos de seguridad. Pueblo v. Feliciano Hernández,* 113 D.P.R. 371 (1982).

■ Los Arts. 68 y 69 del Código Penal, 33 L.P.R.A. secs. 3353–3354, que proveen la preparación de informes psiquiátricos, sociales y psicológicos, y una vista en la que el acusado puede controvertir dichos informes, operan cuando el tribunal va a imponer una medida de seguridad, pero no cuando lo que se va a imponer es una penalidad adicional por reincidencia.

## VI

Cabe advertir que en la jurisdicción federal se ha seguido una trayectoria similar a la nuestra. La legislación federal adoptada en 1970 mediante la Ley Pública Núm. 91–452, 84 Stat. 948 (1970), estableció un procedimiento especial mediante el cual se le concedía a los "delincuentes especiales peligrosos" el derecho a una vista antes de que éstos fueran sentenciados. La vista tenía como propósito el permitirle al acusado cuestionar la imputación de la delincuencia especial. Ello siempre que cumpliera con varios requisitos procesales desde el momento en que se iniciaba la acusación. 18 U.S.C. sec. 3575.

Tanto las disposiciones contenidas en 18 U.S.C. sec. 3575 como otras, *fueron derogadas en 1984* al adoptarse el *Sentencing Reform Act* de 1984. Ley Pública Núm. 98–473, 98 Stat. 1987. Con la derogación de estas secciones y la adopción de la nueva ley, el Congreso intentó uniformar de una manera efectiva los procedimientos de sentencia. 98 Stat. 3222 (1984).

## VII

█ El Art. 74 del Código Penal, *supra*, según enmendado, al perder su carácter de medida de seguridad y constituirse como medida punitiva de reincidencia, se configuró como una norma de carácter sustantivo que autoriza la imposición de una penalidad mayor.

█ La Regla 13(A) de Evidencia define "presunción" como:

> ... [U]na deducción de un hecho que la ley autoriza a hacer o requiere que se haga de otro hecho o grupo de hechos previamente establecidos en la acción. A ese hecho o grupo de hechos previamente establecidos se le denomina hecho básico; al hecho deducido mediante la presunción se le denomina hecho presumido. 32 L.P.R.A. Ap. IV.

█ Se ha dicho que las presunciones no son propiamente evidencia, sino reglas que controlan el modo de evaluar la evidencia. E.L. Chiesa, *Sobre la validez constitucional de las presunciones*, 14 (Núm. 1) Rev. Jur. U.I.A. 727 (1979). A tenor con la definición contenida en las Reglas de Evidencia, las presunciones regulan las inferencias que puede hacer el juzgador a partir de determinado hecho y el efecto que tiene sobre las partes de presentar prueba en contrario. Weinstein, *Weinstein's Evidence Manual*, Nueva York, Ed. Mathew-Bender, 1987, Sec. 5.01; Chiesa, *supra; Pueblo v. González Beníquez*, 111 D.P.R. 167 (1981). Así, por ejemplo, si en un juicio se presenta prueba sobre un hecho que se le denomina "hecho básico", las Reglas de Evidencia regulan las deducciones que debe o puede hacer el juzgador, el efecto que puede tener sobre las partes y su obligación de rebatir el hecho presumido. Existe una diferencia entre inferencia y presunción: la primera es la deducción que hace el juzgador de un hecho probado sin que medie un mandato de ley; la segunda es la deducción de un hecho probado regulado

por la ley. E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1983, Vol. I, Cap. III, pág. 39; *Pérez Aldarondo v. Tribunal Superior*, 102 D.P.R. 1 (1974); *Murcelo v. H.I. Hettinger & Co.*, 92 D.P.R. 411 (1965).

◼ Las presunciones pueden ser, a su vez, controvertibles o incontrovertibles. Las controvertibles son aquellas que admiten prueba en contrario para refutar el hecho presumido; las incontrovertibles son aquellas que no permiten prueba en contrario. Las Reglas de Evidencia sólo regulan las presunciones controvertibles. Regla 13 de Evidencia, *supra*; Chiesa, *op. cit.*, pág. 40; *Sucn. Soto v. Vélez*, 60 D.P.R. 215 (1942).

◼ La mayoría de los tratadistas distinguen en dos (2) categorías las presunciones incontrovertibles: aquellas que son verdaderamente presunciones incontrovertibles y aquellas que son normas de derecho sustantivo expresadas en un lenguaje de presunción. Algunos tratadistas llaman a éstas "presunciones conclusivas". 1 *Jones on Evidence* Sec. 3:4, pág. 131 (1972); E.W. Clearly, *McCormick on Evidence*, 3ra ed., Minnesota, Ed. West Publishing Co., 1984, pág. 966; 9 *Wigmore on Evidence* Sec. 2492 (1981).

El profesor Chiesa expresa lo siguiente en relación con estas llamadas "presunciones incontrovertibles":

> En rigor, las llamadas presunciones incontrovertibles son de ordinario seudo presunciones, reglas de derecho sustantivo expresadas bajo la apariencia de presunción. Por ejemplo, la norma sustantiva de derecho penal de que *"los menores de dieciocho años son inimputables"*, puede expresarse —aunque no debe hacerse— en esta forma de *"presunción incontrovertible"*: *"si un imputado tiene menos de dieciocho años* (hecho básico) *entonces es inimputable"* . . . .
>
> . . . [L]a *"presunción incontrovertible" no es un principio de derecho probatorio, sino una norma de derecho sustantivo.*

Debe aclararse que bajo la categoría de presunción se han incluido una serie de principios que no son, en puridad y rigor, presunciones. Si no puede reducirse un principio a la definición de la regla, esto es, a unos hechos básicos y a un hecho presumido o inferido, no estamos frente a una presunción. Estamos frente a "*seudo presunciones*". (Énfasis suplido y en el original.) Chiesa, *op. cit.*, págs. 40–41.

Una presunción incontrovertible o conclusiva no regula las inferencias que deben o pueden hacerse a partir de un hecho básico. Dichas presunciones son normas de carácter sustantivo que encierran un mandato legislativo. La seudopresunción contiene una norma de derecho que debe ser aplicable conforme a los términos del estatuto y no a base de unas inferencias reguladas por la ley. Chiesa, *op. cit.*, pág. 40; Clearly, *op. cit.*, pág. 966; *Wigmore*, supra, Sec. 2492; *Weinstein*, supra, Sec. 5.02.

La confusión provocada por las seudopresunciones radica en que incorporan en su texto la estructura de una presunción: dado el hecho básico se infiere un hecho presumido. En el Art. 74 del Código Penal, *supra*, según enmendado, se ha configurado una seudopresunción que contiene una norma de carácter sustantivo, y no una presunción evidenciaria.

El Art. 74 del Código Penal, *supra*, según enmendado, ha sido redactado en el lenguaje típico de las presunciones incontrovertibles, pues presenta un hecho básico (la convicción previa de dos (2) o más delitos graves) y un hecho supuestamente presumido (la persistente tendencia a delinquir y el carácter de delincuente habitual). Sin embargo, el Art. 74 del Código Penal, *supra*, según enmendado, no ha sido una presunción propiamente dicho, pues el estatuto no regulaba las inferencias que pueda o deba hacer el juzgador a partir del hecho básico. La aplicación de una penalidad

adicional, conforme al Art. 74 del Código Penal, *supra*, según enmendado, depende únicamente de la existencia de unas convicciones previas. El supuesto hecho presumido (la persistente tendencia a delinquir) no es pertinente para propósito de la aplicación de este artículo. Una vez se demuestra la existencia de las convicciones previas, es impertinente si el convicto demuestra efectivamente una persistente tendencia a delinquir.

■ El Art. 74 del Código Penal, *supra*, según enmendado, contenía un mandato legislativo que definía el término "delincuencia habitual" y prescribía la penalidad que se le habría de imponer a aquel acusado cuya conducta resultara acorde con la definición. El referido artículo fue aprobado por el legislador para que el tribunal, si determina probadas las convicciones anteriores, concluya que una persona es delincuente habitual y le imponga una condena en conformidad con los términos establecidos.

■ Una persona que es sentenciada bajo el Art. 74 del Código Penal, *supra*, según enmendado, es convicta porque el legislador dispuso que se le impusiera *una penalidad adicional* a quien ha cometido delitos y ha sido convicto en dos (2) ocasiones anteriores.

■ La imposición de una sentencia al amparo del Art. 74 del Código Penal, *supra*, según enmendado, no requiere la celebración de una vista para permitirle al acusado cuestionar su carácter como delincuente habitual.

■ La aplicación del Art. 74 del Código Penal, *supra*, según enmendado, no depende de una evaluación fáctica adicional de la personalidad o las características del acusado como delincuente habitual. *Specht v. Patterson*, 386 U.S. 605

(1967).(2) Depende de un hecho objetivo: la existencia de dos (2) o más convicciones previas y de la identidad del acusado. Demostrada la existencia de las convicciones previas, procede que se dicte sentencia de acuerdo con los parámetros del Art. 74 del Código Penal, *supra*, según enmendado.

## VIII

El apelante alega también que no se le podía declarar delincuente habitual sin habérsele concedido los beneficios de los Arts. 68 y 69 del Código Penal, *supra*.

Sobre dicha alegación basta con señalar que, al momento de dictarse la sentencia contra el acusado, *no estaban en vigor los Arts. 68 y 69* del Código Penal, *supra*, respecto al

---

(2) En *Specht v. Patterson*, 386 U.S. 605 (1967), el Tribunal Supremo de Estados Unidos interpretó el debido proceso de ley federal en relación con una ley *muy particular* del estado de Colorado denominada *Sex Offenders Act*.

La controversia en dicho caso se circunscribía a la determinación de si el acusado —quien había sido encontrado culpable de la comisión de un delito sexual estatuido en el Código Penal de Colorado, pero no condenado bajo el mismo— podía ser sostenida bajo el *Sex Offenders Act* sin la celebración de una vista.

El *Sex Offenders Act* entraba en operación cuando el tribunal determinaba que el convicto constituía un riesgo para la comunidad, estaba incapacitado de sus facultades mentales o era un ofensor habitual.

Dicha ley especial disponía, específicamente, que al convicto se le hicieran unos exámenes psiquiátricos y que el psiquiatra rindiera un informe escrito al tribunal que contuviera los hechos y las recomendaciones sobre si el convicto debía ser enviado a un hospital o a una "casa del Estado" o de entrenamiento para los mentalmente enfermos. También debía indicar si el convicto podía ser supervisado adecuadamente de ser puesto en probatoria. La ley no proveía, sin embargo, que el convicto tuviera oportunidad de vista o de confrontar los hallazgos y recomendaciones del informe.

El Tribunal Supremo de Estados Unidos concluyó que, en conformidad con las disposiciones del *Sex Offenders Act*, el *delito cometido según la legislación penal general* no constituía el fundamento para dictar la sentencia contra el convicto, *sino que éste activaba otro procedimiento según la ley especial* cuya pena intentaba evitar que el convicto ocasionara daños futuros. Concluyó el Tribunal que, al aplicarse el *Sex Offenders Act*, el acusado se estaba enfrentando *a un nuevo proceso* que implicaba *otro tipo de penalidad criminal*. Dentro de dicho proceso, el informe psiquiátrico tenía una importancia fundamental, por ello el acusado tenía derecho a una vista en la cual pudiera confrontar los hallazgos y recomendaciones del informe.

Nuestra legislación penal *es totalmente distinta* al estatuto de Colorado.

"delincuente habitual". Ley Núm. 17, *supra*; Ley Núm. 76, *supra*; *Pueblo v. Feliciano Hernández*, supra.

## IX

Por último, el apelante de autos fue notificado debidamente en el pliego acusatorio no sólo del delito que se le imputaba, sino de que era un delincuente habitual. Dicha acusación contenía los delitos anteriores que así lo acreditaban.[3]

El apelante, en la lectura de la acusación, aceptó expresamente la imputación de delincuente habitual y se declaró no culpable del delito de robo imputado.[4]

Por las razones expuestas, *se confirma la sentencia apelada*.

El Juez Asociado Señor Hernández Denton emitió opinión disidente, a la cual se une el Juez Asociado Señor Rebollo López.

---

[3] Dicha acusación lee de la manera siguiente:
"Acusación por robo y delincuencia habitual. 23 de agosto de 1982.

.    .    .    .    .    .    .    .

"El acusado, Luis Enrique Reyes Morán, *se alega es delincuente habitual*, por cuanto ha sido convicto y sentenciado por los siguientes delitos:
"(1) G78-17 — Robo
"(2) G81-962 — Tentativa de Escalamiento Agravado
"(3) G78-377 — Robo
"(4) G78-1544 — Aprop. Ilegal Agravada
"(5) G77-1297 — Escalamiento Agravado
"Cometidos éstos en tiempos diversos e independientes unos de otros, demostrando este acusado una persistente tendencia a delinquir." (Énfasis suplido.)

[4] La Minuta de 16 de septiembre de 1982 lee de la manera siguiente: "Manifiesta la defensa que el acusado *acepta la alegación de delincuencia habitual*." (Énfasis suplido.)

—O—

Opinión disidente emitida por el Juez Asociado Señor Hernández Denton, a la cual se une el Juez Asociado Señor Rebollo López.

Por entender que el procedimiento utilizado por el tribunal de instancia para declarar al apelante un delincuente habitual vulneró su derecho constitucional al debido proceso de ley, disentimos de la opinión suscrita por la mayoría del Tribunal.

I

El apelante fue declarado culpable de robo, y concluido el juicio la defensa solicitó que, antes de hacer la determinación correspondiente sobre la persistencia de su delincuencia, se le sometiera a examen siquiátrico y tuviera una oportunidad de controvertir la presunción de la tendencia a delinquir que establecía el Art. 74 del Código Penal, según enmendado, 33 L.P.R.A. ant. sec. 3375.[1] La opinión suscrita por esta Curia confirma la determinación del foro de instancia de que el Art. 74 del Código Penal, *supra*, establecía una presunción incontrovertible, y que la determinación de delincuencia habitual no requería una oportunidad de ser oído para rebatir los informes siquiátricos o sicológicos exigidos por los Arts. 68 y 69 del Código Penal, 33 L.P.R.A. secs. 3353 y 3354.[2]

---

[1] El caso ante nuestra consideración se limita únicamente a cuestionar la interpretación del Art. 74 del Código Penal, según enmendado, 33 L.P.R.A. ant. sec. 3375, antes de ser derogado por la Ley Núm. 34 de 31 de mayo de 1988 (33 L.P.R.A. sec. 3301 *et seq.*)

[2] Los referidos artículos establecen:
"Examen Siquiátrico e Informes
"Artículo 68.—
"No podrá imponerse medida de seguridad sin previo examen e informe siquiátrico y/o sicológico de la persona, realizado por siquiatra o sicólogo clínico designado por el Tribunal y un informe social realizado por un Oficial Probatorio.

## II

Tanto en Puerto Rico como en Estados Unidos, los estatutos sobre reincidencia han respondido al reclamo de la sociedad por una mayor protección contra delincuentes, para quienes las penas impuestas no tienen un efecto rehabilitador. C.W. Torenson, Jr., *The Habitual Criminal Act: Quantity of Convictions Only?*, 59 (Núm. 1) Neb. L. Rev. 507 (1980). Con el propósito de aislar a estos convictos y proteger al país de sus hábitos delictivos, el Congreso de Estados Unidos, al igual que la Asamblea Legislativa de Puerto Rico y cuarenta y dos (42) estados de la unión norteamericana, han promulgado leyes(3) que utilizan como criterio rector para su aplicación la cantidad de delitos anteriormente cometidos por el acusado, aun cuando este elemento no es una guía certera para diferenciar al delincuente habitual de los otros.(4)

Desde sus orígenes, se concibió la delincuencia habitual como una medida de naturaleza dual. Consistía en una combinación de elementos característicos de las medidas de seguridad y de reincidencia. Esta clasificación pretendía lograr una solución "sui géneris" al reconciliar el interés de la sociedad en la rehabilitación de los acusados con el reclamo

---

"Dichos informes, con exclusión de sus fuentes informativas que se declaran confidenciales, le serán notificados a las partes.

"Vistas

"Artículo 69.—

"Las partes podrán controvertir estos informes, en el cual caso se celebrará vista, a la que deberán ser llamados a declarar los autores de dichos informes a solicitud de parte." 1974 Leyes de Puerto Rico 470.

(3) Véase D. Katkin, *Habitual Offender Laws: A Reconsideration*, 21 Buffalo L. Rev. 99 (1971–1972).

(4) Véase L. Jiménez de Asúa, *El delito y el Derecho Penal*, 5ta ed., Buenos Aires, Ed. Sudamericana, 1967, pág. 542, donde se hace un análisis sobre la diferencia entre el reincidente y el delincuente habitual. Se categoriza como reincidente a aquel que repite las infracciones, mientras que delincuente habitual es aquel que es incapaz para la pena, contra quien es necesario defenderse con medidas de carácter especial. La habitualidad es "costumbre [que] se incorpor[a] al modo de ser o de obrar de aquel sujeto". Íd., pág. 542.

público de aislar a los delincuentes mientras se lograba su adaptación social. Con esto en mente, se impuso una pena más severa a aquel que cometía un tercer delito, dándole una oportunidad para que se le sometiera a un extenso tratamiento. Pagán Rodríguez, *Proyecto de Código Penal de Puerto Rico*, 6 Rev. Jur. U.I.A. 1, 50 (1971). Esta medida especial no era un castigo al convicto, sino una protección a la sociedad mientras éste estaba bajo tratamiento:

> Esta presunción legal del estado peligroso no debe bastar de por sí, sino que ha de confirmarse por *las conclusiones del examen de la personalidad del delincuente.*
>
> *El simple hecho de satisfacer las condiciones legales no debe[,] pues[,] entrañar automáticamente la imposición de la medida.* Debe quedar siempre al arbitrio judicial el aplicar o no la medida.
>
> En la legislación[,] como en el sistema penitenciario, deben preverse medidas y métodos de tratamiento apropiados a los distintos tipos de delincuentes habituales, y ser aqu[é]llos susceptibles de modificación de acuerdo con las necesidades. ·
>
> La medida no ha de tener por objeto la imposición de una sanción[,] sino la protección de la sociedad y el tratamiento del delincuente. Pagán Rodríguez, *supra.*

En términos generales, la incorporación de las medidas de seguridad al Código Penal fue un proyecto ambicioso que necesitaba, para su exitosa aplicación, recursos y facilidades especializadas. Pagán Rodríguez, *supra*, Apéndice IV. Debido a lo complejo y costoso que resultaba su implantación, las medidas de seguridad quedaron en suspenso por un (1) año cuando comenzó a regir el nuevo Código Penal de 1974 (33 L.P.R.A. sec. 4628). Mediante la Ley Núm. 146 de 3 de julio de 1975 (33 L.P.R.A. sec. 4628), se pospuso la vigencia de estas disposiciones por dos (2) años adicionales.

No obstante, la Sec. 2 de la Ley Núm. 10 de 1ro de diciembre de 1975 (1975 Leyes de Puerto Rico 1050) puso en vigencia el Art. 74 del Código Penal, *supra*, sobre delincuencia habitual, y lo enmendó estableciendo la presunción sobre

la tendencia a delinquir. Sin embargo, en esta enmienda no se eliminó la oración que establecía la reclusión del delincuente habitual hasta que se lograra su adaptación social.

El debate legislativo sobre esta medida es sumamente revelador. Los legisladores entendían que la presunción era controvertible y que el acusado podía cuestionar la determinación de la habitualidad. A esos efectos señala el representante José R. Jarabo en su defensa de la medida:

> Sí; la persona que ha sido convicto de esos dos delitos de los enumerados y luego es convicto de un tercer delito y se le dice, se presume que usted es un delincuente habitual, todavía puede a través de los mecanismos del Código impugnar esta presunc[ió]n a través del informe siquiátrico, sicológico, demostrar que no hay nada en su personalidad que establezca la razonabilidad de esa presunción. [E]s importante señalar aquí que esta ley no podrá ponerse en una aplicación apropiada hasta que se apruebe por esta Asamblea Legislativa en el futuro una Regla de Procedimiento Criminal que tenga que ver de cómo es qu[e] se va a re[b]atir esa presunción. Diario de Sesiones de 9 de octubre de 1975, pág. 173.

Por su parte, el legislador señor Morales Rivera añadió:

> Pero, aún más, las mismas disposiciones del Código sobre los de[li]ncuentes habituales dice que esa persona que ha sido declarada delincuente habitual tiene derecho a rebatir eso en los tribunales y probar, pues, mire, tribunal, aquí d[i]cen que yo soy un delincuente habitual, pero, mire, yo voy a probar que yo no soy un delincuente habitual. Y si esa persona prueba que no es un delincuente habitual, a esa persona hay que sentenciarl[a] en la forma tradicional en que sentencia el Código a los delincuentes. Diario de Sesiones, *supra*, págs. 198–199.

Contrario a lo que afirma la opinión mayoritaria, la intención legislativa fue imponer una pena más severa *dentro del manto rehabilitador establecido por el Código Penal y protegiendo el debido proceso de ley a que tienen derecho los acusados.*

Nuevamente, en 1980 se revisó el referido artículo para adecuarlo al sistema de sentencia determinada y para elimi-

nar la disposición sobre la reclusión hasta conseguir la rehabilitación. Con esta enmienda se pretendía eliminar aquellas secciones en el artículo que tenían carácter de medida de seguridad. Informe de la Comisión de lo Jurídico del Senado sobre el P. del S. 1367 de 11 de marzo de 1988, Consulta Legislativa. Sin embargo, no se eliminó el artículo de la delincuencia habitual del capítulo de medidas de seguridad. Por tanto, su naturaleza dual no fue eliminada.

De la anterior exposición se desprende que la comisión de un tercer delito per se no puede determinar la habitualidad del acusado sin un previo examen de la personalidad del convicto al utilizar los informes requeridos por los Arts. 68 y 69 del Código Penal, *supra*. Sin embargo, una mayoría de esta Curia concluyó, recientemente, que "[l]os Arts. 68 y 69 del Código Penal, *supra*, únicamente operan como *suplemento* a las medidas de seguridad vigentes que no tienen substancialidad propia". *Pueblo v. Mattei Torres*, 121 D.P.R. 600, 622–623 (1988).

Aunque reconocemos que el lenguaje del legislador adolece de unas inconsistencias, no debemos ceder a la tentación de leer solamente las disposiciones que favorecen una interpretación de la ley e ignoran su historial legislativo. La propia Sec. 5 de la Ley Núm. 10, *supra*, también decretó la vigencia inmediata de los Arts. 66, 67, 68, 69, 74, 75 y 76 del Código Penal, 33 L.P.R.A. secs. 3351–3354, 3375, 3391 y 3392, "para los efectos exclusivos de la implementación, y de la aplicación de las medidas de seguridad al delincuente habitual . . .". 1975 Leyes de Puerto Rico 1051.

Por tanto, las medidas de seguridad en su *aplicación exclusiva* al artículo sobre la delincuencia habitual estaban vigentes desde 1975. Era innecesario que leyes posteriores, que prorrogaban la vigencia de las medidas de seguridad, mencionaran el referido Art. 74 del Código Penal. De ser cierta la tesis de la opinión mayoritaria —que la delincuencia habitual como medida de reincidencia se había establecido

desde 1975— ¿por qué no fue hasta 1982, siete (7) años después, que se trajo ante la consideración de esta Curia la controversia sobre la aplicación de las medidas de seguridad a la delincuencia habitual? La conclusión lógica e inevitable es que el Art. 74 del Código Penal, *supra*, constituía una medida híbrida de seguridad y reincidencia, y no nos corresponde enmendarla desde el estrado apelativo.

### III

Hoy, no solamente reafirmamos nuestro disenso a la opinión emitida en *Pueblo v. Mattei Torres*, supra, sino también discrepamos de los nuevos pronunciamientos suscritos por la mayoría que permiten que el Estado declare a un individuo "delincuente habitual" sin cumplir con el debido proceso de ley. Contrario a la trayectoria de este Tribunal de ampliar la protección constitucional consagrada en el Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, hoy una mayoría le niega al apelante su legítimo reclamo de una oportunidad de ser oído y de rebatir la presunción establecida por el Art. 74 del Código Penal, *supra*, antes de ser declarado "delincuente habitual" al amparo de una fórmula híbrida que combina las características de las medidas de seguridad y las de reincidencia.

En este contexto, el negar una oportunidad de ser oído antes de ser separado de la sociedad permanentemente atenta contra el derecho a la libertad del acusado y contra el fiel cumplimiento de las garantías procesales establecidas en nuestro ordenamiento constitucional. Precisamente, para evitar una privación indebida del derecho fundamental a la libertad, a través de los siglos los tribunales hemos elaborado unas salvaguardas que garantizan a todo ciudadano el debido proceso de ley en todas las etapas, incluso la imposición de sentencia. Así, por ejemplo, se requiere la presencia de abogado en la vista de sentencia. *United States v. Fatico*, 458 F. Supp. 388, 402 (N.Y. 1978), al citar con aprobación a

*Mempa v. Rhay*, 389 U.S. 128, 134 (1967); *United States v. Inendino*, 463 F. Supp. 252, 257 (Ill. 1978).

Aunque los tribunales federales han permitido procedimientos informales en la determinación sobre reincidencia, esto no significa que se le niegue una oportunidad adecuada de ser oído. Notas, *The Constitutionality of Statutes Permitting Increased Sentences for Habitual or Dangerous Criminals*, 89 (Núm. 2) Harv. L. Rev. 356 (1975). En el balance entre los intereses gubernamentales y los de la persona afectada, debemos tomar en cuenta que estas exigencias mínimas cuestan muy poco al Estado, especialmente al compararlas con las garantías que ofrece para evitar una privación arbitraria y caprichosa de un derecho formal. *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Goss v. López*, 419 U.S. 565 (1975); *Wolff v. McDonnell*, 418 U.S. 539 (1974); *Morrissey v. Brewer*, 408 U.S. 471 (1972); *Maldonado Elías v. González Rivera*, 118 D.P.R. 260, 270 (1987), voto particular del Juez Asociado Señor Hernández Denton.

Aun cuando no sea necesario la rigurosidad y formalidad de una vista plenaria, los procedimientos que requiere la cláusula de debido proceso de ley, en su mínima aplicación, deben incluir el derecho a una notificación, a vista y a cuestionar la determinación de delincuencia habitual mediante prueba pericial que rebata la presunción. Al establecerse la presunción sobre la tendencia a delinquir, se le dio suficiente discreción al juez *para que, en una vista,* determinara si las convicciones por delitos anteriores cumplían con los requisitos de tiempo, lugar y edad establecidos en las disposiciones sobre la reincidencia. En esa vista el acusado tendría la oportunidad de cuestionar las circunstancias de las convicciones anteriores, y el juzgador tendría la oportunidad de evaluar, con un cuadro más completo, la determinación de la delincuencia habitual del acusado.

No conceder una vista donde puedan hacerse esas determinaciones convierte la presunción del Art. 74 del Código

Penal, *supra*, en una impermisible, y su excesiva amplitud constituye un castigo cruel expresamente vedado por nuestra Constitución y por la Constitución norteamericana. ¿Qué pasaría si los delitos anteriores fueron cometidos cuando el acusado era menor de edad y esto no consta así en el tribunal?; ¿qué pasaría si las convicciones anteriores fueron hace más de diez (10) años y el acusado puede convencer al juzgador de que es capaz de rehabilitarse?

La necesidad de una oportunidad de ser oído ha sido establecida en innumerables ocasiones tanto por el Tribunal Supremo federal como por esta Curia. Desde la década del '60, cuando estaban en su apogeo los ataques constitucionales a los estatutos sobre reincidencia, se ha reconocido la vista como parte del debido proceso de ley que, a través de tantos años, hemos invocado para proteger los derechos de nuestros ciudadanos. *Martínez Torres v. Amaro Pérez*, 116 D.P.R. 717 (1985); *López Vives v. Policía de P.R.*, 118 D.P.R. 219 (1987); *Rivera Santiago v. Srio. de Hacienda*, 119 D.P.R. 265 (1987); *Maldonado Elías v. González Rivera*, supra; *Pueblo v. Méndez Pérez*, 120 D.P.R. 137 (1987); *Rivera v. E.L.A.*, 121 D.P.R. 582 (1988); *Fernández v. Srio. de Hacienda*, 122 D.P.R. 636 (1988). Prueba de ello es la conclusión a que llega el Tribunal Supremo federal en *Oyler v. Boles*, 368 U.S. 448, 452 (1962), al establecer que:

> Sin embargo, un acusado tiene que recibir una notificación razonable y una oportunidad de ser oído con relación al cargo de reincidencia aunque el debido proceso no requiera que la notificación ocurra antes del juicio por el delito cometido. (Traducción nuestra.)

*Por eso, en sus inicios, el estatuto federal proveyó una vista donde el acusado estaba acompañado de su abogado y tenía derecho a contrainterrogar los testigos presentados.* 18 U.S.C. sec. 3575.

Aunque actualmente dicha disposición no tiene vigencia, tampoco se ha establecido de manera clara y categórica que

se hayan eliminado los derechos que los acusados, catalogados como delincuentes habituales, tenían. La eliminación de 18 U.S.C. sec. 3575 se debió a la reforma que en el sistema de imposición de sentencias se hizo en Estados Unidos, y no a problemas inherentes con la determinación de delincuencia habitual. Véase el *Sentencing Reform Act* de 1984, 98 Stat. 1987.

El *Sentencing Reform Act* de 1984, *supra*, creó el *U.S. Sentencing Commission* que está encargada de emitir guías uniformes para la imposición de sentencias en el sistema federal. Entre los criterios a considerar para emitir las guías se encuentran la edad del acusado, su educación, habilidades vocacionales, condición mental y emocional, condición física, empleos anteriores, lazos familiares y responsabilidades, lazos en la comunidad, participación en el delito, historial criminal previo, y el grado de dependencia de la actividad criminal para vivir.

Un examen de estos criterios revela la intención de adecuar la imposición de sentencia a los conceptos modernos de derecho penal y criminología. No podemos, como hace la mayoría, y sin tener las guías uniformes sobre imposición de sentencias, adelantar el resultado a que va a llegar la comisión en cuanto a la delincuencia habitual.

No obstante el historial legislativo, estos precedentes y la costumbre federal, la opinión de este Tribunal concluye que "[l]a imposición de una sentencia al amparo del Art. 74 del Código Penal, *supra*, según enmendado, no requiere la celebración de una vista para permitirle al acusado cuestionar su carácter como delincuente habitual". Opinión mayoritaria, pág. 807. Para apoyar dicha conclusión, cita a *Specht v. Patterson*, 386 U.S. 605 (1967). Sin embargo, un análisis detallado del caso revela que éste sostiene otra conclusión. Allí se trataba de un estatuto donde el Tribunal Supremo federal hacía una determinación sobre el carácter del acusado a base de un informe psiquiátrico. La ley en cuestión no tomaba

como fundamento para imponer la sentencia la convicción del delito por el que fue juzgado, sino que la convicción por ese delito servía de fundamento para iniciar otro procedimiento distinto donde se impondría una sentencia si llegaba a determinarse que el acusado constituía un peligro para la sociedad y si era un delincuente habitual o un enfermo mental. *Specht*, supra, pág. 608. Por tanto, aun cuando teóricamente un estatuto de esta naturaleza puede ser distinguible de uno sobre reincidencia, el tribunal reconoce que son similares al concluir que *el caso no es distinto a aquéllos bajo estatutos de reincidencia donde la cuestión sobre la habitualidad es una "cuestión distinta" (Graham v. West Virginia, 224 U.S. 616, 625 (1912)) en la que un acusado tiene que recibir una notificación razonable y una oportunidad de ser oído.* Véanse: *Oyler v. Boles*, supra; *Chandler v. Fretag*, 348 U.S. 3, 8 (1954).

Al ignorar todo este trasfondo doctrinal, hoy se decide negarle la oportunidad a un acusado de controvertir la determinación sobre delincuencia habitual. No se trata de facilitar la liberación de estas personas, sino de proveerle una oportunidad mínima de ser oído en un procedimiento que salvaguarde sus derechos fundamentales. Privar de la libertad a un ser humano y lesionar su dignidad al declararlo "delincuente habitual" sin una vista es insostenible en nuestro ordenamiento constitucional. Afirmar, como lo sostiene la mayoría, que de un hecho objetivo (las dos (2) convicciones) se deduzca un hecho subjetivo, como es la declaración de delincuencia habitual, sin ningún dato empírico y sin oportunidad de rebatir, es contrario a nuestro sentido de justicia y al fin perseguido al adoptarse la medida.

Lamentablemente, hoy cambiamos la trayectoria de vanguardia en la protección de los derechos constitucionales que en el pasado hemos seguido. Nos olvidamos que nuestra función como Jueces requiere que velemos por que exista en nuestro país un sistema de justicia justo para todos por

igual, donde se respeten aquellos derechos fundamentales que sirven de apoyo a éste. Véase *Pueblo v. López Rodríguez*, 118 D.P.R. 515, 544 (1987), opinión disidente del Juez Asociado Señor Rebollo López. De lo contrario, debilitamos los cimientos de nuestro sistema de justicia que a través de tantos años hemos afianzado.

Por las razones anteriormente expuestas, modificaría la sentencia del tribunal de instancia y devolvería el caso únicamente para que se celebre una vista donde se determine la delincuencia habitual del apelante.

